CRESCENT J. ROSELLE AND DOROTHY ROSELLE, LOUIS P. ROSELLE AND MARY G. ROSELLE, ARTHUR ROSELLE AND JOSEPHINE ROSELLE, JOSEPH C. ROSELLE AND ANITA ROSELLE, ESTATE OF PETER ROSELLE, DECEASED, VERNOICA ROSELLE, EXECUTRIX, AND VERONICA ROSELLE, Petitioners v COMMISSIONER OF INTERNAL REVENUE, Respondent
Roselle v. Commissioner
Docket No. 7902-76.
United States Tax Court
T.C. Memo 1981-394; 1981 Tax Ct. Memo LEXIS 346; 42 T.C.M. (CCH) 539; T.C.M. (RIA) 81394; July 30, 1981. *346 During 1972, a partnership provided management services to three corporations and engaged in other activities in which capital was a material income-producing factor. Held, for purposes of sec. 1348, I.R.C. 1954, the management services provided by the partnership constituted a separate trade or business and capital was not a material income-producing factor in that business. Held further, the management services income constitutes earned income under sec. 1348, I.R.C. 1954. John J. O'Toole, for the petitioners. Alyce Halchak, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies in petitioner's 1972 Federal income taxes as follows: Name
Deficiency
Crescent J. Roselle and
$ 16,978
Dorothy Roselle
Louis P. Roselle and
$ 16,763
Mary G. Roselle
Arthur Roselle and
$ 16,920
Josephine Roselle
Joseph C. Roselle and
$ 12,246
Anita Roselle
Estate of Peter Roselle
$ 14,114
and Veronica Roselle
After concessions, the sole issue for decision is the amount of the income of the Peter Roselle and Sons partnership which constitutes earned income under section 1348. [1] *347 FINDINGS OF FACT Some of facts have been stipulated and are found accordingly. At the time the petition was filed, petitioners Crescent J. Roselle and Dorothy Roselle, husband and wife, Louis P. Roselle and Mary G. Roselle, husband and wife, Arthur Roselle and Josephine Roselle, husband and wife, Joseph C. Roselle and Anita Roselle, husband and wife, and Veronica Roselle resided in New Jersey. Veronica Roselle filed this action both in her individual capacity and as executrix of the Estate of Peter Roselle. Crescent J. Roselle and Dorothy Roselle, Louis P. Roselle and Mary G. Roselle, Arthur Roselle and Josephine Roselle, Joseph C. Roselle and Anita Roselle, and Peter Roselle and Veronica Roselle each filed joint income tax returns for their 1972 taxable year. During 1972, Crescent J. Roselle, Louis P. Roselle, Arthur Roselle, Joseph C. Roselle, and Peter Roselle (hereinafter sometimes referred to as "petitioners") were equal partners of the Peter Roselle and Sons partnership (hereinafter referred to as the "partnership"). The partnership was organized in 1948 to engage in the refuse collection and disposal *348 business. Crescent J. Roselle, Louis P. Roselle, Arthur Roselle, and Joseph C. Roselle are brothers. Peter Roselle is their father. The Roselle family has been connected with the refuse collection and disposal industry since 1911 when Peter Roselle entered the business. The brothers have worked in the refuse collection business most of their lives. From their extensive background in the refuse collection business, petitioners were experienced and able managers. During 1972, the principal enterprises of the partnership were (1) a scavenger operation (refuse collection for the private sector as opposed to a municipality), (2) the rental of equipment, and (3) the provision of management services to three corporations engaged in the business of refuse collection. The partnership maintained a record of the income generated by each of its activities. The partnership had the following items of gross income for 1972: Item
Amount
Scavenger Operation
$ 349,547.41
Equipment Rental
255,064.00
Management Fees
315,821.03
Real Estate Rental
25,330.00
Subcontracting
13,432.50
Interest
2,171.01
Capital Gain
61.09
Total
$ 961,427.04
The partnership had net ordinary income of $ 529,471.99 for 1972. The generation *349 of the partnership's capital gain, interest, subcontracting, and real estate rental income was unrelated to its provision of management services. At the close of its 1972 taxable year, the partnership owned trucks and equipment, containers, and real estate valued at $ 263,718.21, $ 89,727.09, and $ 189,781.64, respectively. The partnership scavenger operation was conducted in Essex, Hudson, and Union Counties, New Jersey. The partnership used two to three garbage trucks in this operation, and any one partner could provide whatever supervision was required. The partnership began its rental equipment business after it ceased operating a garbage dump in 1968. During 1972, the partnership primarily rented equipment connected with refuse collection. During 1972, the partnership provided management services to the following three corporations: Peter Roselle and Sons Co. and Fereday and Meyer Co., Inc. (hereinafter referred to as "Fereday"), Roselle-Lippman Co. (hereinafter referred to as "Lippman"), and Waste Disposal, Inc. (hereinafter referred to as "Waste Disposal"). Petitioners were shareholders of each of these corporations and some of them were also officers of the corporations. *350 The officers, shareholders, and their percentage of stock ownership of these corporations in 1972 were as follows: Fereday
Percentage of
Name
Office Held
Stock Ownership
Alfred Lippman
President
50
Crescent J. Roselle
Secretary-Treasurer
12.50
Louis P. Roselle
Vice President
12.50
Arthur Roselle
Vice President
12.50
Joseph C. Roselle 6.25
Peter Roselle 6.25
Lippman
Percentage of
Name
Office Held
Stock Ownership
Alfred Lippman
President
45
Crescent J. Roselle
Secretary-Treasurer
10
Louis P. Roselle
10
Arthur Roselle
10
Joseph C. Roselle
10
Peter Roselle
10
Rosalind Shapiro
5
Waste Disposal
Percentage of
Name
Office Held
Stock Ownership
Joseph C. Roselle
President
8
Crescent J. Roselle
Secretary-Treasurer
8
Louis P. Roselle
Asst. Secretary-Asst.
Treasurer
8
Arthur Roselle
8
Peter Roselle
8
William Stavola
Vice President
25
Michael Stavola
Vice President
25
Other
10
These corporations paid no dividends during 1972. The partnership provided management services to Fereday, Lippman, and Waste Disposal pursuant to separate agreements entered into prior to 1972. These agreements provided that the partnership was to receive 15 percent of the gross income of Fereday and Lippman and 5 percent of the gross income of Waste Disposal in exchange for its management *351 services. During 1972, the three corporations paid the partnership total management fees as follows: Corporation
Management Fee
Fereday
$ 167,102.70
Lippman
64,517.16
Waste Disposal
84,201.17 The management fees were paid to the partnership solely for the management services rendered by petitioners. During 1972, Fereday and Lippman operated out of a building located in Elizabeth, New Jersey, which was owned by Peter Roselle and Sons Company, a corporation wholly owned by the Roselle family. Both Fereday and Lippman paid rent to Peter Roselle and Sons Company for their use of the building. Fereday engaged in both municipal and private refuse collection in Union County, New Jersey. Lippman engaged in refuse collection exclusively for two municipalities in New Jersey. During 1972, Waste Disposal conducted its refuse collection operation out of Neptune, New Jersey, and operated a garbage dump in Howell, New Jersey. The Waste Disposal refuse collection operation was the most complicated of the three corporations and covered a relatively large area. Its area of operation was a significant distance from the area in which the other corporations operated. Consequently, in order to adequately *352 manage Waste Disposal, Joseph C. Roselle moved his home and family to the area in which Waste Disposal operated and that corporation became his primary responsibility. Thereafter, Joseph C. Roselle received a salary from Waste Disposal, and petitioners agreed to a concomitant reduction of the partnership's management fee to five percent of Waste Disposal's gross income. During 1972, Fereday rented equipment from the partnership on a continuing basis because it had acquired a new refuse collection contract at the end of 1971 and was unable to make a commitment to purchase the equipment it needed to perform that contract. Fereday paid the partnership $ 124,800 for equipment rental in 1972. In early 1973, Fereday purchased the additional equipment it needed to perform the new contract. Lippman and Waste Disposal also rented equipment from the partnership, but only intermittently in the case of an emergency breakdown. During 1972, the partnership also rented equipment to other parties. The partnership charged the corporations separately for any equipment rented, and the cost thereof was not included in the management fees. In providing their management services, petitioners supervised *353 all aspects of the day-to-day operations of the three corporations. Their duties included laying-out routes, renting equipment when necessary, purchasing equipment, supervising the servicing of equipment, supervising the labor, dealing with labor problems, and preparing bids on contracts. In some instances, petitioners were on call 24 hours a day, and their work day from Monday through Saturday could run from 5 a.m. to 8 p.m. During the day, petitioners were in constant communication by phone and radio and would travel to wherever they were needed. While Joseph C. Roselle spent a substantial part of his time managing Waste Disposal, he would travel elsewhere if his help was needed. Similarly, if he needed help, one of the other petitioners would come to his assistance. Petitioners functioned as a "team" to provide the management the corporations required. On occasion, regular employees of the corporations would not show up for work. In those instances, petitioners hired men that, although not on the daily payroll, would show up in the morning looking for work. Petitioners employed these men wherever they were needed for the day and their salary was paid by the entity for whom *354 they worked. The cost of their services was not included in the management fees paid to the partnership. On their 1972 returns, each petitioner reported $ 105,894.39 as his distributive share of the partnership's net ordinary income. Petitioners treated the full amount of their distributive shares as earned income for purposes of computing the maximum tax under section 1348. In the notices of deficiencies, respondent determined that only 30 percent of each petitioner's distributive share was earned income under section 1348 because capital was a material income-producing factor in the partnership. OPINION We must determine the amount of the partnership's income for 1972 which constitutes earned income under section 1348. Section 1348[2] *355 *356 *357 limits the maximum marginal tax rate on earned taxable income to 50 percent. Earned income is defined for purposes of section 1348 as "earned income within the meaning of section 401(c)(2)(C) or section 911(b)." [3] The relevant provision [4] in the instant case is section 911(b), which provides: (b) Definition of Earned Income.--For purposes of this *358 section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary or his delegate, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income. [Emphasis added.] Respondent maintains that capital was a material incomeproducing factor in the partnership and, therefore, only 30 percent of each petitioner's distributive share of the partnership's net income is earned income under section 1348. Petitioners concede that capital was a material income-producing factor with respect to all the partnership's activities, except the management services. *359 Petitioners argue that the management services must be considered separately from the partnership's other activities in applying the limitations of section 911(b) and contend that capital was not a material income-producing factor with respect to those services. The definition of earned income set forth in section 911(b) provides that a maximum of 30 percent [5] of the net profits of a trade or business in which both personal services and capital are material income-producing factors may be considered earned income. See also section 1.1348-3(a)(3)(i), Income Tax Regs. For purposes of section 1348, we view the language of section 911(b) as requiring a separate determination of the applicability of this limitation with respect to each trade or business. It is clear that respondent has treated the entire income of the partnership as arising from a single trade or business in determining that only 30 percent of each petitioner's distributive share of the partnership's net income is earned income. Therefore, we must decide whether the management services rendered by petitioners were part of an integrated trade or business together with one or more of the other activities of the partnership *360 or constituted a separate trade or business for purposes of applying the earned income limitations under section 1348. [6]
It is well settled that a taxpayer may have more than one trade or business. Achong v. Commissioner, 246 F. 2d 445, 447 (9th Cir. 1957), affg. a Memorandum Opinion of this Court; Sherman v. Commissioner, 16 T.C. 332, 337 (1951). The existence of a separate business is not precluded by common ownership. *361 See Collins v. Commissioner, 34 T.C. 592, 597 (1960); Davis v. Commissioner, 29 T.C. 878, 891 (1958). [7] *362 The question of whether activities under common ownership constitute separate businesses has arisen in several contexts. See, e.g., Davis v. Commissioner, 65 T.C. 1014 (1976)(section 162); Nielsen v. Commissioner, 61 T.C. 311 (1973)(section 355); Lester v. Commissioner, 40 T.C. 947 (1963)(section 355); Davis v. Commissioner, 29 T.C. 878 (1958)(section 130, I.R.C. 1939); Peterson Produce Company v. United States, 205 F. Supp. 229 (W.D. Ark. 1962)(section 446(d)), affd. 313 F. 2d 609 (8th Cir. 1963). See also B. Bittker and J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 13-14, pp. 13-20 13-24 (4th ed. 1979). Whether the management services considered herein constitute a separate trade or business is essentially a question of fact. We have found as facts that the partnership's capital gain, interest, subcontracting, and real estate rental income were unrelated to its provision of management services. Thus, there remains for our consideration whether the management services and either one or both of the partnership's other two principal enterprises were part of the same trade or business. On the basis of the facts and circumstances herein, we are convinced that the management services rendered by petitioners constituted a separate trade or business for purposes of section 1348. Initially, the record shows that the provision of management services was not simply an incidential activity of the partnership, but would have been entitled to trade or business status had it been the partnership's sole activity. Furthermore, while we are cognizant of the fact that the principal ventures of the partnership were all related to the business of refuse collection, the provision of management services to entities engaged in the business of refuse collection is clearly distinguishable from the rental of refuse collection equipment *363 or the operation of one's own refuse collection business. Although these activities were under petitioner's common ownership, they each represent distinct types of business activities. In addition, while there is nothing to indicate that the partnership kept separate books with respect to the management services, a record of the income from each activity was maintained, and the partnership's accountant testified that in maintaining its records he considered the three principal enterprises of the partnership to represent separate and distinct businesses. Moreover, we do not believe that the manner in which the partnership conducted its three principal business activities requires these activities to be treated as a single integrated trade or business. The record persuades us that the management services and the other principal activities were not dependent upon one another for the production of income. While Fereday, Lippman, and Waste Disposal, under petitioners' direction, rented equipment from the partnership during 1972, Lippman and Waste Disposal only rented in emergencies and the continuing rental by Fereday was due to an unusual set of circumstances. Thus, the record shows *364 that the corporations only rented equipment from the partnership in exigent circumstances. In addition, the partnership rented equipment to other parties. Moreover, it is clear that there was a separate charge for any equipment rented and that the management fees were paid solely for the management services rendered by petitioners. The mere fact that Fereday, Lippman, and Waste Disposal rented equipment from the partnership under such circumstances does not require its equipment rental and management services activities to be treated as a single trade or business for purposes of section 1348. With respect to the partnership's refuse collection operation, we are unable to find any link between it and the management services furnished to the corporations. Although respondent argues that a portion of the management fees represents a charge for the use of the partnership's labor, we have found otherwise. We now consider whether capital was a material incomeproducing factor in the partnership's management services business. [8]Whether capital is a material income-producing factor is determined from all the facts and circumstances of the particular case. Bruno v. Commissioner, 71 T.C. 191, 197 (1978); *365 Rousku v. Commissioner, 56 T.C. 548, 550 (1971). Capital is considered a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business. Moore v. Commissioner, 71 T.C. 533, 538 (1979); Bruno v. Commissioner, supra at 199. On the other hand, capital is not a material income-producing factor if the gross income of the business consists principally of fees, commissions, or other compensation for personal services. Moore v. Commissioner, supra at 538; Bruno v. Commissioner, supra at 199. Section 1.1348-3(a)(3)(ii), Income Tax Regs., sets forth the test for determining whether capital is a material income-producing factor: (ii) Whether capital is a material income-producing factor must be determined by reference to all the facts of each case. *366 Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business, as reflected, for example, by a substantial investment in inventories, plant, machinery, or other equipment. In general, capital is not a material income-producing factor where gross income of the business consists principally of fees, commissions, or other compensation for personal services performance by an individual . Thus, the practice of his profession by a doctor, dentist, lawyer, architect, or accountant will not, as such, be treated as a trade or business in which capital is a material incomeproducing factor even though the practitioner may have a substantial capital investment in professional equipment or in the physical plant constituting the office from which he conducts his practice since his capital investment is regarded as only incidental to his professional practice. [Emphasis added.] Applying these principles to the instant case, we hold that capital was not a material income-producing factor in the partnership's management services business, and, therefore, the amount of the management fees which *367 may be treated as earned income is not limited to 30 percent of the net profits of the business. Clearly, petitioners' experience and ability in the refuse collection industry was the principal factor in the generation of the management fees. See Bruno v. Commissioner, supra at 200; Miller v. Commissioner, 51 T.C. 755, 759 (1969). We are satisfied that the management fees paid to the partnership represent compensation for personal services performed by petitioners and that any capital utilized in providing those services was merely incidental to the production of income. See Bruno v. Commissioner, supra at 201. Our decision to apply the 30 percent rule separately with respect to each trade or business is in accord with the Congressional intent underlying section 1348. The stated purpose for the enactment of section 1348 was to reduce the incentive for the use of tax loopholes through the reduction of the tax rate on earned income. H. Rept. No. 91-413 (1969), 1969-3 C.B. 208, 230. It is clear, however, that the 30 percent rule will, in some instances, arbitrarily deny earned income treatment to income attributable to personal services and to that extent it undermines the purpose *368 of section 1348. The legislative history of the amendment that excised the 30 percent rule from section 1348[9] states, in part, as follows: In certain situations the 30-percent net profits limitations unfairly treats individuals who conduct their businesses as sole proprietorships or partnerships by imposing a greater tax burden on them then [sic] is imposed on an individual who conducts the identical business in corporate form. [Emphasis added.] S. Rept. No. 95-1263 (1978), 1978-3 C.B. (Vol. 1) 506. See also H. Rept. No. 95-1800 (1978), 1978-3 C.B. (Vol. 1) 603. Thus. Congress recognized the arbitrary nature of the 30 percent rule. Certainly, this problem would be unnecessarily compounded and the stated purpose of section 1348 further undermined with respect to taxable years prior to the effective date of the above legislation if we ignored the clear language of section 911(b) and applied the 30 percent rule to each trade or business of a taxpayer simply because capital was a material income-producing factor in one of his businesses. Accordingly, we hold that the full amount of the management fees constitutes earned income under section 1348. [10] We have considered *369 respondent's other arguments and find them unpersuasive. [11] To reflect the foregoing, Decision will be entered under Rule 155. [12]
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable year involved herein.
2. During the year in issue, sec. 1348 provided as follows: (a) General Rule.--If for any taxable year an individual has earned taxable income which exceeds the amount of taxable income specified in paragraph (1), the tax imposed by section 1 for such year shall, unless the taxpayer chooses the benefits of part I (relating to income averaging), be the sum of-- (1) the tax imposed by section 1 on the lowest amount of taxable income on which the rate of tax under section 1 exceeds 50 percent, (2) 50 percent of the amount by which his earned taxable income exceeds the lowest amount of taxable income on which the rate of tax under section 1 exceeds 50 percent, and (3) the excess of the tax computed under section 1 without regard to this section over the tax so computed with reference solely to his earned taxable income. In applying this subsection to a taxable year beginning after December 31, 1970, and before January 1, 1972, "60 percent" shall be substituted for "50 percent" each place it appears in paragraphs (1) and (2). (b) Definitions.--For purposes of this section-- (1) Earned income.--The term "earned income" means any income which is earned income within the meaning of section 401(c)(2)(C) or section 911(b), except that such term does not include any distribution to which section 72(m) (5), 72(n), 402(a)(2), or 403(a)(2)(A) applies or any deferred compensation within the meaning of section 404. For purposes of this paragraph, deferred compensation does not include any amount received before the end of the taxable year following the first taxable year of the recipient in which his right to receive such amount is not subject to a substantial risk of forfeiture (within the meaning of section 83(c)(1)). (2) Earned taxable income.--The earned taxable income of an individual is the excess of-- (A) the amount which bears the same ratio (but not in excess of 100 percent) to his taxable income as his earned net income bears to his adjusted gross income, over (B) the amount by which the greater of-- (i) one-fifth of the sum of taxpayer's items of tax preference referred to in section 57 for the taxable year and the 4 preceding taxable years, or (ii) the sum of the items of tax preference for the taxable year, exceeds $ 30,000. For purposes of subparagraph (A), the term "earned net income" means earned income reduced by any deductions allowable under section 62 which are properly allocable to or chargeable against such earned income. (c) Married Individuals.--This section shall apply to a married individual only if such individual and his spouse make a single return jointly for the taxable year. 3. An amendment to sec. 1348 applicable to taxable years beginning after December 31, 1976, has replaced the term "earned income" with the phrase "personal service income." Sec. 302(a), Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1554, 1976-3 C.B. (Vol. 1) 30. Personal service income means any income which is earned income within the meaning of sec. 401(c)(2)(C) or sec. 911(b) or which is an amount received as a pension or annuity which arises from an employer-employee relationship or from tax-deductible contributions to a retirement plan. See sec. 701(x)(1)↩, Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2920, 1978-3 C.B. (Vol. 1) 154. 4. Sec. 401(c)(2)(C)↩, inapplicable here, defines earned income as "gains (other than any gain which is treated under any provision of this chapter as gain from the sale or exchange of a capital asset) and net earnings derived from the sale or other disposition of, the transfer of any interest in, or the licensing of the use of property (other than good will) by an individual whose personal efforts created such property."
5. For taxable years beginning after December 31, 1978, sec. 1348(b)(1) has been amended to provide that "section 911(b) shall be applied without regard to the phrase, 'not in excess of 30 percent of his share of net profits of such trade or business.'" Sec. 442(a), Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2878, 1978-3 C.B. (Vol. 1) 112. Therefore, in the case of a trade or business in which both personal services and capital are material income-producing factors, sec. 1348↩ now treats as earned income a reasonable allowance for personal services without imposing any maximum. 6. On brief, respondent asserted that petitioners have conceded that the partnership conducted one trade or business. We disagree with respondent since the record does not reveal such a concession.↩
7. These cases arose under sec. 130 of the 1939 Code. This provision disallowed trade or business losses of individuals under certain circumstances and applied separately to each trade or business. Sec. 130 of the 1939 Code was reenacted as sec. 270 of the 1954 Code. Sec. 270 was repealed for taxable years beginning after December 31, 1969. Sec. 213(b), Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 572, 1969-3 C.B. 58↩.
8. The issue of whether capital is a material income-producing factor has arisen under other Internal Revenue provisions as well as section 1348. See, e.g., sec. 37(e)(9); sec. 911(b); sec. 704(e)(1); sec. 1361(b)(4)(repealed); sec. 25(a)(4), I.R.C. 1939↩; sec. 200, Revenue Act of 1918, ch. 18, 40 Stat. 1058; sec. 200, Revenue Act of 1921, ch. 136, 42 Stat. 227.
9. See note 5 supra↩.
10. Pursuant to sec. 702(b), each petitioner is entitled to treat his distributive share of the management fees as earned income. See sec. 1.702-1(b), Income Tax Regs. See also sec. 1.702-1(a)(8)(ii), Income Tax Regs.↩
11. Since petitioners have conceded that capital was a material income-producing factor with respect to the other income of the partnership, such income is subject to the earned income limitations set forth in section 911(b)↩.
12. In determining his tax liability under sec. 1348, each petitioner must reduce his distributive share of the management fees by his share of any expenses allocable thereto in order to ascertain "earned net income." Sec. 1348(b)(2). See also Rev. Rul. 74-231, 1974-1 C.B. 240↩. On the record herein we are unable to determine the amount of expenses properly allocable to the management fees. We expect the parties to resolve this matter pursuant to the Rule 155 computation.